## Case No. 3,746.

### DE FOREST et al. v. REDFIELD.

[4 Blatchf. 478.][1]

Circuit Court, S. D. New York. Dec. 29, 1860.

CUSTOMS DUTIES — DEPRECIATED FOREIGN CURRENCY—REGULATIONS BY PRESIDENT—CONSULAR CERTIFICATE AS EVIDENCE.

1. Under the proviso to the 61st section of the act of March 2, 1799 (1 Stat. 673), which author.zes the president to make fit and proper regulations for estimating the duties on imported goods, in respect to which the cost shall be exhibited in a depreciated foreign currency, the president cannot fix an arbitrary value to such foreign currency, without regard to its intrinsic value, as compared with the money of the United States.

2. A consular certificate, attached to an invoice, as to the value of the foreign currency in which the invoice is made out, is only prima facie evidence of such value, and may be contradicted by the importer.

3. An importer being required, under the 36th section of the act of March 2, 1799 (1 Stat. 655), to specify, in his entry, the species of money in which the invoice is made out, and it being required, by the 2d section of the act of March 3, 1801 (2 Stat. 121), that the invoices of goods subject to ad valorem duties, shall be made out in the currency of the country from which the importation is made, and shall contain a statement of the actual cost in such currency, without respect to the value of the coins of the United States in such country, and it being provided by the 61st section, of the act of March 2, 1799 (1 Stat. 673), that all denominations of foreign money not therein enumerated shall be estimated in value, as nearly as may be, according to the intrinsic value thereof compared with money of the United States, an importer, whose invoice and entry are correctly made out in a denomination of foreign money not enumerated in said 61st section, is entitled to have the value of his goods estimated, for the purposes of duties, according to the intrinsic value of such foreign money compared with the money of the United States.

This was an action against [Heman J. Redfield] the collector of the port of New York, to recover back an excess of duties, paid under protest, upon numerous importations of merchandise, during the years 1853, 1854, 1855, and 1856, from the island of Porto Rico, a part of the Spanish dominions. The plaintiffs [George B. De Forest and others] claimed that the merchandise was invoiced at the legalized nominal currency of Porto Rico, called Macuquino currency, and that $1.12½ of said currency was intrinsically worth only one of the dollars of the United States,

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

of the weight of 412½ grains, and of the fineness of 90 grains of standard silver. It appeared, that the silver coins of Spanish America were formerly of various shapes, being melted and then flattened and clipped until they were of the requisite weights. They were then stamped with given devices, to show their values and the republics in which they were coined. These coins were neither round nor flat, and were easily lessened in weight by clipping, by which their intrinsic value was greatly reduced. In this clipped condition, they were many years ago, introduced into the Island of Porto Rico, and were known and circulated as Macuquino coins. In 1843, the royal authorities of that island, having assayed said coins, decreed that they should be a legal tender at the rate of 112½ Macuquino dollars to 100 United States or Spanish silver dollars then in existence, although the decree was not generally promulgated until 1853. From that time, all business transactions on the island were governed and controlled by that decree, until the close of the year 1857, when the authorities of Porto Rico called in from circulation all the genuine Macuquino coins, and paid for them at the aforesaid rates. After the United States, under the acts of February 21, 1853, and March 3, 1853 (10 Stat. 160, 188, 189), coined and issued half dollars and other smaller fractional parts of a dollar, of the standard fineness but less than the standard weight (206¼ grains) fixed for the half dollar by the act of January 18, 1837 (5 Stat. 137), reducing the weight to 192 grains for the half dollar, and in the same proportion for the lesser fractional parts of a dollar, these new coins were introduced into Porto Rico. Thereupon, the royal authorities of the island caused them to be assayed, and, under date of March 20th, 1854, issued a decree, that these new fractional coins of the United States should circulate and be received by the inhabitants and royal treasury of the island at the rate of 54–100 Macuquino currency to 48–100 of the United States or Spanish standard silver dollar. As soon as information of this decree was received at the United States treasury department, the secretary of the treasury issued the following circular: "General Instructions to Collectors and Other Officers of the Customs. Macuquino Currency. No. 22. Treasury Department, May 1st, 1854. Sir: Since the date of the general instructions No. 21, transmitted to you on the 10th ultimo, this department has been advised, by the consul of the United States at St. Johns, in the island of Porto Rico, that the authorities of that island had determined, on the 20th of March last, that, after that date, the value of the silver dollar of the United States, of the coinage of 1853 and after, should be at the rate of one hundred and eight cents Macuquino, or eight per cent. premium over the Macuquino currency of the said island of Porto Rico. You will be regulated ac-

cordingly, in your estimate of duties on invoices of goods from said island arriving at your port. James Guthrie, Secretary of the Treasury." Before the issuing of this circular, the defendant had exacted from the plaintiffs duties on merchandise invoiced in Macuquino currency, at the rate of 106¼ dollars of that currency to 100 United States dollars. These duties were paid under protest. After the issuing of the circular, the defendant exacted from the plaintiffs duties on goods thus invoiced, at the rate of 108 Macuquino to 100 United States dollars. These duties, also, were paid under protest.

John S. McCulloh, for plaintiffs.
James I. Roosevelt, Dist. Atty., for defendant.

SMALLEY, District Judge. Were the exactions which were made by the defendant before the issuing of the treasury circular of May 1st, 1854, and those made by him under the circular, in accordance with the law or in violation thereof? The 36th section of the act of March 2, 1799 (1 Stat. 655), provides, that the owner, consignee or factor, &c., shall make entry in writing, &c., "particularly specifying the species of money in which the invoices thereof are made out." The 2d section of the act of March 3, 1801 (2 Stat. 121), provides, that "from and after the thirtieth day of June next, the invoices of all goods imported into the United States and subject to a duty ad valorem shall be made out in the currency of the place or country from whence the importation shall be made, and shall contain a true statement of the actual cost of such goods in such foreign currency or currencies, without any respect to the value of the coins of the United States * * * in such foreign place or country." The 61st section of the act of March 2, 1799 (1 Stat. 673), fixing the value of certain foreign coins and currencies, among which the Macuquino currency is not enumerated, provides, that "all other denominations of money shall be estimated in value, as nearly as may be, according to the intrinsic value thereof compared with money of the United States." It is conceded, that the plaintiffs' invoices were correctly made out according to the 36th section of the act of March 2, 1799, and the 2d section of the act of March 3, 1801; and the evidence shows conclusively and without contradiction, that the difference between the intrinsic value of the Macuquino currency and the money of the United States, was 12½ per cent., as claimed by the plaintiffs, instead of 6¼ or 8 per cent., as insisted upon by the defendant.

It is quite evident, that the treasury circular of May 1, 1854, originated in a misconception of the royal decree of Porto Rico, of March 20, 1854, and was issued, as appears from the circular itself, on the supposition that said decree extended to the standard

silver dollar of the United States, when, in point of fact. it was expressly limited to the half dollar and the lesser fractional parts thereof. But is argued, that, under the proviso to the 61st section of the act of 1799, the circular of the secretary of the treasury, of May 1, 1854, with the regulation therein promulgated, is conclusive upon the rights of the plaintiffs, although it may have originated in error, and although the statements in it are unfounded. That proviso reads, "that it shall be lawful for the president of the United States to cause to be established fit and proper regulations for estimating the duties on goods, wares and merchandise imported into the United States, in respect to which the original cost shall be exhibited in a depreciated currency, issued and circulated under authority of any foreign government." The plaintiffs' counsel insist, that the phrase "depreciated currency" is not applicable to the Macuquino coins, but that such coins were what is known as "scaled" or "lightened" coins, as defined in the 3d section of the act of April 21, 1806 (2 Stat. 405). But. in the view I take of the case, it is unnecessary to consider how that term should be construed.

We have already seen, that the law makes it imperative upon the importer to make, in his invoice, a true statement of the actual cost of the goods in the currency of the country from which they are imported, without respect to the coin of the United States. Was it intended, by conferring the power to establish "fit and proper regulations," to enable the president, through the secretary of the treasury, or otherwise, to fix an arbitrary value to such foreign coin, without regard to its intrinsic value, as compared with the money of the United States? If so, he might, at his pleasure, increase or diminish the rate of duties. accordingly as he might happen to favor a high or low tariff, or as he might think the exigencies of the occasion required, without regard to the legislative branch of the government. If he could thereby change the intrinsic value of foreign coin. 6¼ or 4 per cent., he might 15 per cent. It would, in effect, enable him to make or remake the revenue laws. not only without consulting, but in defiance of, the senate and the house of representatives. No such construction ever has been, or can be, given to the words in question, by any judicial tribunal. They were intended to authorize the president to make "fit and proper regulations," to sustain and carry out the revenue laws relating to foreign coins, and not to violate them. It can only be regarded as matter of surprise, that, under our federal constitution, any high officer of the government should have claimed for the president any such extraordinary power, and it is not understood that the then secretary of the treasury did.

It is also argued, that some of the consular certificates attached to the plaintiffs' in-

voices, state the value of the Macuquino currency to be 6¼ and others 8 per cent. less than the United States dollar, and that such certificates are conclusive as to such value and cannot be contradicted. Many of the certificates, however, state the difference to be 12½ per cent., as the fact really was. It appears, from the proofs, that such certificates as stated it at less than 12½ per cent. were framed and issued under orders from the treasury department. This position of the defendant is not tenable. The law makes it necessary, that the importer should procure the certificate of the United States consul or commercial agent at the foreign port from which the goods are shipped, not only as to the value of the foreign currency in which the invoice is made out, but as to the value of the goods in such port, and without it they cannot be entered at the custom-house at all; but it has never been considered that such certificate was more than prima facie evidence, either as to the value of the currency or of the merchandise. It would be singular, indeed, if the certificate of such inferior officers of the government in relation to questions of fact could be held to conclude the party against whom they were presented from showing the truth.

Again, it is contended, that the protests, or at least some of them, are too vague and indefinite, and do not set out distinctly that the intrinsic relation between the Macuquino currency and the United States standard dollar is as 112½ to 100. This objection is not sustained by the papers. In all that have been submitted to the court, the difference between the two currencies is clearly and specifically stated. The plaintiffs must have judgment for the excess of duties exacted and paid under protest, being the difference between the Macuquino currency as estimated and insisted upon by the defendant, and the intrinsic value thereof as before stated.